# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In Re: ASACOL ANTITRUST LITIGATION | Civil Action No. 1:15-cv-12730 (DJC) |
| This Document Relates To: | |
| ALL END-PAYOR ACTIONS | |

## REPLY MEMORANDUM IN SUPPORT OF
## END-PAYOR PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................... 1

II.    PLAINTIFFS HAVE ARTICLE III STANDING. ............................................... 1

III.   THE CLASS IS ASCERTAINABLE. .................................................................... 3

IV.   THE CLASS IS SUFFICIENTLY NUMEROUS. ................................................ 4

V.    THE NAMED PLAINTIFFS' CLAIMS ARE TYPICAL OF THE CLASS. .................... 5

VI.   THE NAMED PLAINTIFFS ARE ADEQUATE CLASS REPRESENTATIVES. .......... 6

VII.  PREDOMINANCE IS SATISFIED. ...................................................................... 8

      A.    Dr. Conti's damages model fits Plaintiffs' theory of liability. ............................... 9

            i.   Antitrust impact to consumers can be shown by common proof. .................... 13

            ii.  Antitrust impact to TPPs can be proven by common proof. ........................... 15

            iii. Plaintiffs have provided an accepted methodology for calculating aggregate class-wide damages. ........................................................................................ 16

VIII. A CLASS ACTION IS A SUPERIOR METHOD OF ADJUDICATION ...................... 18

IX.   CONCLUSION ...................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Mills,*
   286 U.S. 397 (1932) ................................................................................................ 6

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,*
   568 U.S. 455 (2013) ................................................................................................ 8

*Arreola v. Godinez,*
   546 F.3d 788 (7th Cir. 2008) .................................................................................. 2

*Bigelow v. RKO Radio Pictures,*
   327 U.S. 251 (1946) .............................................................................................. 16

*Carnegie v. Household Int'l, Inc.,*
   376 F.3d 656 (7th Cir. 2004) ................................................................................ 18

*Comcast Corp. v. Behrend,*
   133 S. Ct. 1426 (2013) ................................................................................ 9, 10, 16

*Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130,*
   657 F.2d 890 (7th Cir. 1981) .................................................................................. 7

*Gratz v. Bollinger,*
   539 U.S. 244 (2003) ................................................................................................ 2

*Hawaii v. Standard Oil Co. of Cal.,*
   405 U.S. 251 (1972) .............................................................................................. 11

*In re Buspirone Patent & Antitrust Litig.,*
   185 F. Supp. 2d 363 (S.D.N.Y. 2002) ................................................................... 2

*In re Cardizem CD Antitrust Litig.,*
   200 F.R.D. 326 (E.D. Mich. 2001) .......................................................... 4, 7, 12, 17

*In re Deepwater Horizon,*
   739 F.3d 790 (5th Cir. 2014) .................................................................................. 2

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.,*
   275 F.R.D. 382 (D. Mass. 2011) ............................................................................ 5

*In re Grand Theft Auto Video Game Consumer Litig.,*
   No. 06 MD 1739, 2006 U.S. Dist. LEXIS 78064, (S.D.N.Y. Oct. 25, 2006) ............. 2

*In re High-Tech Emple. Antitrust Litig.*,
   985 F. Supp. 2d 1167 (N.D. Cal. 2013) ................................................................. 12

*In re Lidoderm Antitrust Litig.*,
   No. 14-md-02521-WHO, 2017 U.S. Dist. LEXIS 24097 (N.D. Cal. Feb. 21, 2017) ......... 12, 18

*In re Nexium (Esomeprazole) Antitrust Litig.*,
   297 F.R.D. 168 (D. Mass. 2013) ................................................................... passim

*In re Nexium (Esomeprazole) Antitrust Litig.*,
   968 F. Supp. 2d 367 (D. Mass. 2013) ................................................................. 2

*In re Nexium Antitrust Litig.*,
   777 F.3d 9 (1st Cir. 2015) ........................................................................... passim

*In re Playmobil Antitrust Litig.*,
   35 F. Supp. 2d 231 (E.D.N.Y. 1998) ................................................................. 4

*In re Relafen Antitrust Litig.*,
   221 F.R.D. 260 (D. Mass. 2004) ................................................................... 3, 4

*In re Urethane Antitrust Litig.*,
   768 F.3d 1245 (10th Cir. 2014) ....................................................................... 12

*In re Vitamins Antitrust Litig.*,
   209 F.R.D. 251 (D.D.C. 2002) ....................................................................... 5

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
   No. 1917, 2013 U.S. Dist. LEXIS 137946 (N.D. Cal. Sep. 19, 2013) ...................... 12

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
   451 U.S. 557 (1981) ..................................................................................... 16

*Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO Funds*,
   571 F.3d 672 (7th Cir. 2009) ......................................................................... 12

*Krell v. Prudential Insurance Company of America*,
   148 F.3d 283 (3d Cir. 1998) ........................................................................... 2

*Matamoros v. Starbucks Corp.*,
   699 F.3d 129 (1st Cir. 2012) ..................................................................... 3, 7, 8

*Mims v. Stewart Title Guar. Co.*,
   590 F.3d 298 (5th Cir. 2009) ......................................................................... 12

*Mowbray v. Waste Management Holdings, Inc.*,
   189 F.R.D. 194 (D. Mass. 1999) ..................................................................... 2

*Payne v. Goodyear Tire & Rubber Co.*,
    216 F.R.D. 21 (D. Mass. 2003) ................................................................................................ 9

*Piazza v. Ebsco Indus.*,
    273 F.3d 1341 (11th Cir. 2001) ............................................................................................... 2

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
    632 F.3d 762 (1st Cir. 2011) .................................................................................................... 3

*Sparkle Hill, Inc. v. Interstate Mat Corp.*,
    No. 11-cv-10271, 2012 U.S. Dist. LEXIS 178793 (D. Mass. Dec. 18, 2012) ......................... 4

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) .................................................................................................................... 1

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011) ..................................................................................................... 2

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) .......................................................................................................... 3, 4

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
    208 F.3d 288 (1st Cir. 2000 .................................................................................................. 2, 8

## I.      INTRODUCTION

Defendants used a hard-switch product hop to foreclose generic competition for Asacol 400mg and force Plaintiffs to pay higher prices for their ulcerative colitis treatments.  The elements of proof at trial in this case will center almost exclusively on common evidence of Defendants' misconduct.  The impact on consumers and third-party payors ("TPPs") of foreclosed generic competition in the prescription pharmaceutical industry is systematic and predictable.  The End-Payor Class should be certified as a class action and nothing in Defendants' opposition undermines that conclusion.

## II.     PLAINTIFFS HAVE ARTICLE III STANDING.

Plaintiffs have Article III standing to pursue their claims.  Article III standing is a straightforward inquiry that asks whether the plaintiff has suffered an "injury in fact," fairly traceable to the defendant's conduct, which can be redressed by the requested relief.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998).  Each Plaintiff paid overcharges as a result of Defendants' foreclosure of generic competition to Asacol 400mg, and the relief sought will compensate them for their injuries.  *In re Nexium Antitrust Litig.*, 777 F.3d 9, 32 (1st Cir. 2015) ("It is undisputed that the named plaintiffs have shown that they were overcharged for at least one Nexium transaction during the class period, establishing standing.").

Defendants incorrectly argue that Named Plaintiffs cannot bring claims on behalf of Class members that purchased Asacol 400mg in Class states where the Named Plaintiffs themselves have not made purchases.[1]  Defendants conflate Article III standing with Rule 23 procedural requirements.  Once a class representative establishes Article III standing, whether that party may then represent absent class members "depends solely on whether he is able to

---

[1] Defs. Opp'n to End-Payor Pls. Mot. for Class Certification at 4-5, ECF No. 397 ("Defs. Br.").

meet the additional criteria encompassed by Rule 23."[2]  Rule 23 imposes no requirement that Named Plaintiffs have the exact same purchasing pattern as absent Class members[3]; the question is whether Named Plaintiffs' claims are "sufficiently typical" of the absent Class members.[4]

In an antitrust case alleging generic foreclosure, "[a]ll members of the putative class have a common interest in litigating claims arising from the Defendants' allegedly anticompetitive [conduct] designed to cause the End-Payors to pay supracompetitive prices across the several states." *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367,  407 (D. Mass. 2013).  Here, the Named Plaintiffs may pursue claims on behalf of absent Class members from all 26 Class states.  *See Mowbray v. Waste Management Holdings, Inc.*, 189 F.R.D. 194, 202 (D. Mass. 1999) (certifying multi-state class even where the named plaintiff's claim arose under a single state law), *aff'd Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288 (1st Cir. 2000).

Named Plaintiffs and putative Class members with purchases in other states suffered the same overcharge injuries under the same legal theory—monopolization—recognized by all Class states.[5]  This alignment of legal elements and facts provides the requisite "identity of issues" and

---

[2] 7AA Charles Alan Wright, et al., Federal Practice and Procedure § 1785.1 (3d ed. 2010) (once named plaintiff establishes his own standing, "whether he will be able to represent the putative class . . . depends solely on whether he is able to meet the additional criteria encompassed by Rule 23"); *Krell v. Prudential Insurance Company of America*, 148 F.3d 283, 306-07 (3d Cir. 1998); *In re Deepwater Horizon*, 739 F.3d 790, 800-01 (5th Cir. 2014); *Arreola v. Godinez*, 546 F.3d 788, 795 (7th Cir. 2008); *Piazza v. Ebsco Indus.*, 273 F.3d 1341, 1351 (11th Cir. 2001); *In re Buspirone Patent & Antitrust Litig.*, 185 F. Supp. 2d 363, 377 (S.D.N.Y. 2002); *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172, 193-94 (D. Mass. 2003).

[3] *See, e.g., Gratz v. Bollinger*, 539 U.S. 244, 264-65 (2003) (although class representative *transfer* student arguably had a different claim than *freshman* absent class members, the challenged conduct did not "implicate a significantly different set of concerns" among the class members); *Piazza*, 273 F.3d at 1351 ("[T]here is no similar requirement that all putative class members share identical claims." (internal citation and quotation marks omitted)).

[4] *In re Grand Theft Auto Video Game Consumer Litig.*, No. 06 MD 1739 (SWK) (MHD), 2006 U.S. Dist. LEXIS 78064, at *10-11 (S.D.N.Y. Oct. 25, 2006) (the decision to certify a multi-state class "will demand an analysis of whether the Named Plaintiffs' claims are sufficiently typical of  the Class's claims"); *see also Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 305 (3d Cir. 2011) ("The question is not what valid claims can plaintiffs assert; rather, it is simply whether common issues of fact or law predominate.").

[5] See End-Payor Pls. Mem. of Law in Supp. of Class Certification at 9, ECF No. 381 ("Pls. Br.").

"alignment of incentives" between Plaintiffs and absent Class members.  *See Plumbers' Union*

*Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 771 (1st Cir.

2011).  In *Nexium*, the First Circuit affirmed class certification where the named plaintiffs did

not have purchases in all the class states.  *Nexium*, 777 F.3d at 31-32.[6]

## III.    THE CLASS IS ASCERTAINABLE.

A proposed class is ascertainable where "the court [is] able to resolve the question of

whether class members are included or excluded from the class by reference to objective

criteria."  *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 139 (1st Cir. 2012).  Plaintiffs meet that

standard here.  An individual or entity is included in the proposed Class if they: (1) purchased

and/or paid for Delzicol or Asacol HD after July 31, 2013, and (2) also purchased and/or paid for

Asacol 400mg prior to July 31, 2013.[7]  Defendants do not dispute the Class definition is based

on objective criteria, and "[t]he presence of such an objective criterion overcomes the claim that

the class is unascertainable."  *Matamoros.*, 699 F.3d at 139.[8]

Binding Supreme Court law states that specific class member identification is premature

at this stage.[9]  Defendants attempt to distinguish this case on the grounds that here Plaintiffs

"have not suggested any procedure for identifying class members."  Defs. Br. at 7.  That is

factually incorrect and legally irrelevant.  Factually, Plaintiffs *did* propose a model procedure for

---

[6] *See, e.g., In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 267-68, 288  (D. Mass. 2004) (certifying classes of purchasers from Arizona, California, Massachusetts, Tennessee, and Vermont, even though the named plaintiffs had purchases only in California and Massachusetts).

[7] The Class exclusions here are similarly objective.  Pls. Br. at 3; *Nexium,* 777 F.3d at 19 ("The class definition here satisfies these [ascertainability] standards by being defined in terms of purchasers of Nexium during the class period (with some exceptions that also satisfy objective standards).").

[8] Defendants' citation to Third Circuit and Eastern District of Tennessee case law is unavailing; those cases applied an "ascertainability" standard at odds with the First Circuit.  *See* Defs. Br. at 6.

[9] Pls. Br. at 8, n. 10 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1050 (2016)).

post-verdict allocation and identification in their model trial plan.[10]  Legally, the *Tyson* Court

stated flatly that challenges to methods of identifying uninjured class members were premature

even at the post-verdict stage of the case.  *Tyson*, 136 S. Ct. at 1050 ("Whether that or some

other methodology will be successful in identifying uninjured class members is a question that,

on this record, is premature. Petitioner may raise a challenge to the proposed method of

allocation when the case returns to the District Court for disbursal of the award.").  If the

Supreme Court found that challenges to plaintiffs' ability to identify individual class members

was premature at the post-verdict stage, it is certainly premature (and unnecessary) to entertain

Defendants' arguments here at the class certification stage.

## IV.    THE CLASS IS SUFFICIENTLY NUMEROUS.

Rule 23(a)(1) requires that the proposed class be so numerous that joinder is

impracticable—not impossible.  A proposed class of "forty or more" is generally sufficient to

satisfy the numerosity requirement.  *Sparkle Hill, Inc. v. Interstate Mat Corp.*, No. 11-cv-10271,

2012 U.S. Dist. LEXIS 178793, at *4 (D. Mass. Dec. 18, 2012).  Defendants argue that

Plaintiffs' reliance on "a single year's prescriptions figure" does not allow the Court to determine

how many consumers and TPPs are included in the Class.  Defs. Br. at 13-14.  But "[a] finding

of numerosity may be supported by common sense assumptions, and it is especially appropriate

in antitrust actions brought under Rule 23(b)(3)."[11]  Common sense and basic math dictate that a

prescription volume of 612,000 in a single year—spread throughout the Class states—will more

---

[10] Appendix C to the End-Payor Pls. Mem. of Law in Supp. of Class Certification at 7, ECF No. 381-3.

[11] *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 239 (E.D.N.Y. 1998) (citing 4 Newberg § 18.03 n.17 (2d ed. 1985)); *see Relafen*, 221 F.R.D. at 267; *see also In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 335 (E.D. Mich. 2001) ("[Plaintiffs]indicate that public data reveals that over 13 million prescriptions for Cardizem CD were filled in the United States in 1998 alone. Accordingly, it is reasonable to assume that there are thousands of class members in Michigan and to further assume that joinder would be impracticable.").

likely than not include at least 40 consumer and/or TPP Class members.[12]  In an effort to argue otherwise, Defendants misquote the First Circuit for the proposition that "'individual prescriptions cannot serve as a proxy for individual consumers' or TPPs."  Defs. Br. at 7.  The excerpt from *Nexium* was actually part of the First Circuit's rejection of defendants' "uninjured consumer" arguments—the same arguments Defendants raise here.  *Nexium*, 777 F.3d at 27-28 ("Fourth, defendants incorrectly treat individual prescriptions of Nexium as a proxy for individual consumers.").  While prescription numbers do not equate to individual consumers precisely—that was the First Circuit's point— the question is not whether 612,000 prescriptions equals 612,000 individual consumers.  The question is whether 612,000 prescriptions in a single year raises the inference that more than 39 end-payors were injured over the (more than four year) Class period.  The answer is yes.

The proposed Class is sufficiently numerous and joinder is impracticable.

## V.   THE NAMED PLAINTIFFS' CLAIMS ARE TYPICAL OF THE CLASS.

Plaintiffs satisfy Rule 23(a)(3)'s typicality requirement if their claims "arise from the same course of conduct and are based on the same legal theory as the class claims."  *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 275 F.R.D. 382, 389 (D. Mass. 2011). "Specifically in the antitrust context, typicality will be established by plaintiffs and all class members alleging the same antitrust violations by defendants."  *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260 (D.D.C. 2002) (internal citations and quotation marks omitted).  Defendants do not challenge Plaintiffs' allegations that their claims are based on the same course of

---

[12] If the 612,000 prescriptions were split among fewer than 40 Class members—as Defendants suggest is plausible—it would mean 15, 692 annual prescriptions per Class member, 1,307 prescriptions per month, or 43 prescriptions per day, for each Class member (assuming 39 Class members).  Defendants have provided no evidence—and Plaintiffs are not aware of any—suggesting such a purchasing pattern is possible here, much less likely.

conduct—the withdrawal of Asacol 400mg and introduction of Delzicol—and the same legal theory—monopolization—as the Class claims.

Instead, Defendants argue inexplicably that Named Plaintiffs, Teamsters and IL IBEW, are atypical because "[n]either MA Teamsters nor IL IBEW has viable claims remaining in this case." Defs. Br. at 9. That is incorrect. Teamsters has pre-July 31, 2013 Asacol 400mg purchases in Nevada and New Hampshire, and IL IBEW has pre-July 31, 2013 Asacol 400mg purchases in Florida, Nevada, and Wisconsin—states with viable claims for TPPs and consumers in this case. Both have post-July 31, 2013 purchases of Asacol HD or Delzicol.[13] In an attempt to criticize the other two Named Plaintiffs—MN Laborers and WI Masons—Defendants assert that they are atypical because they "passed on [] alleged overcharges to fund contributors in future periods." Defs. Br. at 9. This exact "pass-on" theory from Defendants' has been squarely rejected by the First Circuit based upon long-established Supreme Court precedent. *Nexium*, 777 F.3d at 27 ("[A]ntitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset.") (citing *Adams v. Mills*, 286 U.S. 397, 407 (1932)).[14]

The Named Plaintiffs' claims are based on the same set of facts, arising from the same course of conduct, and resulting in the same type of injury as the absent Class members' claims.

## VI.    THE NAMED PLAINTIFFS ARE ADEQUATE CLASS REPRESENTATIVES.

Plaintiffs are adequate Class representatives. "A naked allegation of antagonism cannot defeat class certification; there must be an actual showing of a real probability of a potential

---

[13] See Exs. 3-4 to the Decl. of Kenneth A. Wexler in Supp. of End-Payor Pls. Mot. for Class Certification ("Wexler Decl."), ECF No. 382.

[14] Defendants also cite *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 80 (D. Mass 2005), for the proposition that the Named Plaintiffs here are not typical or adequate (Defs. Br. at 8-9) but their reliance is misplaced. There, named plaintiff TPPs' adequacy and typicality were analyzed where named plaintiffs were susceptible to specific dispositive statute of limitation defenses that could not be leveled against other class members. That is not the case here.

conflict which goes to the subject matter of the suit." *In re Cardizem CD Antitrust Litig.*, 200

F.R.D. 326, 337 (E.D. Mich. 2001) (citation omitted).  "A showing of an alignment of incentives

between the class and the class representatives can sufficiently overcome a challenge on conflict

of interest grounds." *In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168, 172 (D.

Mass. 2013).  Courts have recognized that consumers and TPPs "suffer[] identical economic

injuries"[15] from delayed generic entry and have the "same interest in maximizing the aggregate

amount of classwide damages."[16]  Dr. Conti's damages model identifies separate TPP and

consumer damages on a monthly basis; there is no conflict.  *E.g.*, Conti Decl. at Attachment

C.10.c, columns 12-13.

     Defendants attempt to manufacture a damages allocation conflict between consumers and

TPPs.[17]  As in *Nexium*, Defendants argue that the Named Plaintiffs come from only one group of

payors in the putative End-Payor Class, creating a conflict of interest because each group has

"their own, unique circumstances under which their interests diverge[]" on damages allocation.

Defs. Br. at 9-10; *Nexium*, 297 F.R.D. at 172-73 ("[P]otential issues with the damages allocation

are but weak indicators of existing conflicts of interest between the named representative

plaintiffs and the remaining class members.").  Where the overarching question bears on the

defendant's conduct, the parties have the same objective in proving the defendant's liability.

---

[15] *Nexium*, 297 F.R.D. at 172.

[16] *Cardizem*, 200 F.R.D. at 337 (citation omitted); *see also Matamoros*, 699 F.3d at 138 ("[P]erfect symmetry of interests is not required and not every discrepancy among the interests of class members renders a putative class action untenable." (citations omitted)).

[17] Defs. Br. at 9-10.  In evaluating the credibility of defendants' attacks on Rule 23 "adequacy," the Seventh Circuit has keenly noted: "When it comes, for instance, to determining [defendants' arguments on] whether 'the representative parties will fairly and adequately protect the interests of the class,' or the plaintiffs' ability to finance the litigation, it is a bit like permitting a fox, although with a pious countenance, to take charge of the chicken house."  *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 895 (7th Cir. 1981).

*See, e.g., In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 218 (E.D. Pa. 2012); *Nexium*, 297

F.R.D. at172.

Far from bearing on "fundamental"[18] issues in this case, Defendants' argument that TPPs

are somehow better off with generic foreclosure due to "co-pay/co-insurance differentials" and

brand rebates is—along with the "pass-on" fiction—speculative and cannot establish an inherent

conflict.  Defendants do not contend that TPPs did not incur an overcharge on at least one

transaction due to rebates or copay differentials but instead argue that TPPs are likely not

damaged in their total purchases on *average*.[19]  "Paying an overcharge caused by the alleged

anticompetitive conduct on a *single purchase* suffices to show—as a legal and factual matter—

impact or fact of damage."  *Nexium*, 777 F.3d at 27 (emphasis added).  Any subsequent offset is

irrelevant to whether a consumer or TPP was *injured*. *Id*. ("[D]efendants incorrectly assume that

if a class member offsets an overcharge through later savings attributable to the same or related

transaction, there is no injury.").  The adequacy requirement is satisfied.

## VII.    PREDOMINANCE IS SATISFIED.

 "Rule 23(b)(3) does not require a plaintiff seeking class certification to prove that each

'elemen[t] of [her] claim [is] susceptible to classwide proof.'"  *Amgen Inc. v. Conn. Ret. Plans &*

*Tr. Funds*, 568 U.S. 455, 469 (2013) (citation omitted).  Instead, courts look for "a sufficient

constellation of common issues bind[ing] class members together."  *Waste Mgmt. Holdings, Inc.*

*v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000).  "A single, central issue as to defendant's

---

[18] *See e.g. Nexium.*, 297 F.R.D. at 172-73; *Matamoros,* 699 F.3d at 138.

[19] See Strombom Decl. ¶¶  65 (characterizing an uninjured Plaintiff as one who would have paid more for generic Asacol 400mg "over the entire damages period"); 66 (finding that 26 plans "had lower payment *on average* for Delzicol" compared to the but-for generic price) (emphasis added).  Consistent with the briefing schedule in this case, Plaintiffs will move to exclude Dr. Strombom's analyses as directly contrary to Supreme Court and First Circuit law.

conduct vis a vis class members can satisfy the predominance requirement even when other elements of the claim require individualized proof." *Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 27 (D. Mass. 2003) (citation and quotation marks omitted).  Contrary to Defendants' assertions, "[t]he End-Payors at this stage of litigation need not prove individualized proof of injury." *Nexium*, 297 F.R.D. at 183 (citation and quotation omitted).

Defendants do not contest the fact that the vast majority of the antitrust liability analysis in this case is common to the Class.  *See* Verdict Form, *In re Nexium Antitrust Litig.*, No. 1:12-md-02409, ECF No. 1383 (D. Mass. Dec. 5, 2014).  Plaintiffs' model trial plan also illustrates how, in practice, the trial in this case will focus almost exclusively on evidence common to the Class.  See Wexler Decl., App. C.

## A.    Dr. Conti's damages model fits Plaintiffs' theory of liability.

The Supreme Court's decision in *Comcast* "simply requires the moving party to present a damages model that directly reflects and is linked to an accepted theory of liability under Rule 23(b)(3)." *Nexium*, 297 F.R.D. at 183; *Nexium*, 777 F.3d at 18  Dr. Conti's damages model satisfies this standard.  Plaintiffs present a single theory of antitrust liability against Defendants—the market foreclosure of generic Asacol 400mg.  Dr. Conti's aggregate damages model reflects the impact of generic foreclosure on the Asacol 400mg market and is "consistent with [Plaintiffs'] liability case, particularly with respect to the alleged anticompetitive effects of the violation." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).

As in *Nexium*, Defendants do not establish a *Comcast* problem; they quibble with the merits of Dr. Conti's conclusions and cloak those disputed criticisms as a *Comcast* problem. Defendants fail to explain how Dr. Conti's use of prescription-level data creates incongruity

between her damages model and Plaintiffs' theory of liability.[20]  Defendants' product hop forced Plaintiffs to pay more for Delzicol and Asacol HD vis-à-vis generic Asacol 400mg on a per prescription basis because Defendants' misconduct was the material cause of generic Asacol 400mg foreclosure.  Dr. Conti modeled precisely this theory of liability for Class members.

In manufacturing a "*Comcast* problem," Defendants present three primary arguments; all are unpersuasive.  First, Defendants argue that Dr. Conti overstates damages because "her damages model includes TPPs that did not purchase Asacol 400mg." Defs. Br. at 12.  This is incorrect.  On any given insured transaction captured by the damages model, the prescription is essentially shared by the insured consumer and the consumer's TPP.  As Dr. Conti recognizes, there are some consumers who purchased Delzicol or Asacol HD but *never* purchased Asacol 400mg and are therefore not in the Class.  Conti Decl. ¶ 67.  She excludes a certain volume of prescription damages to account for those consumers.  *Id*.  However, those prescriptions *are* overcharge damages for the TPP partner to the transaction.  A TPP, unlike a single consumer, has purchases from numerous consumers.  See Rebuttal Expert Report of Rena Conti ("Conti Reply"), dated August 16, 2017, ¶ 25.[21]  Thus, even when a given prescription may belong to a *consumer* that is not included in the Class (the "new prescription" Asacol HD or Delzicol patient), it is more likely than not that same prescription *is* paid for by a TPP Class member.  *Id*. Dr. Conti is correct to include those Class member damages in her calculation.  *Id*.[22]  Defendants

---

[20] Defs. Br. at 11-12 (arguing that Dr. Conti's use of prescription level data "provides no information on the potential class members making any purchase" and is therefore "incapable of determining which potential members are in or out of the class").

[21] Exhibit A to Decl. of Kenneth A. Wexler to End-Payor Pls. Reply Mem. in  Supp. of Class Certification.

[22] Dr. Conti also explains that "in order for a TPP to be excluded from injury on this basis they would have to have paid for *only* Delzicol and Asacol HD purchases and *no* Asacol 400mg purchases."  *Id*. (emphasis in original).  She estimates that the number of TPPs that actually meet this criteria is *de minimis*, and further notes that neither Dr. Strombom nor Dr. Zona have confirmed the existence of any such TPP.  *Id.*

have provided no evidence substantiating (much less quantifying) their assertion that there is some number of "new prescription only" TPPs undermining Dr. Conti's conclusions.

Second, Defendants argue that Dr. Conti failed to exclude TPP damages for MA, VT, and MO.[23]  Defs. Br. at 13-14.  This is incorrect.  Dr. Conti included only consumer damages for those three states; TPP damages are excluded.  Conti Decl. at ¶ 67 n. 81.

Finally, Defendants raise a familiar argument that non-Class member Pharmacy Benefit Managers ("PBMs," *i.e.*, administrative intermediaries that offer services to TPP Class members and drug manufacturers) hypothetically "absorb" some of the Class member TPP prescription overcharges if they fail to meet the terms of administrative service guarantees with their TPPs. Defs. Br. at 14.   This argument is specious.  PBMs do not purchase or reimburse for pharmaceutical products and are excluded from the Class, as they were in *Nexium*.  Dr. Strombom does not substantiate or quantify the speculative and unlikely assertion that there are PBMs that "fail to meet the standards guaranteed in the contract," much less that any single PBM actually bore part of the "purchase price" for a TPP Class member as a result of such failure.

### B.   Plaintiffs can prove antitrust impact on a classwide basis.

"Antitrust impact occurs the moment the purchaser incurs an overcharge.  The antitrust impact concept differs from the related task of assessing antitrust damages."  *Nexium*, 297 F.R.D. at 179-80; *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 n.14 (1972) ("[C]ourts will not go beyond the fact of this injury [*i.e.* antitrust impact] to determine whether the victim of the overcharge has partially recouped its loss in some other way . . . .")).  "To the extent Defendants focus on the quantum of damage suffered in their common impact analysis, . . . their focus is misplaced.  Common proof of impact is possible without common damage amounts."  *Cardizem*,

---

[23] The court's motion to dismiss ruling eliminated TPP claims—but not consumer claims—for purchases made in MA, VT, and MO.  *See* Mem. and Order at 32, ECF. No 110.

200 F.R.D. at 309 (citation omitted).  Plaintiffs need not *prove* antitrust impact at class

certification, but must show that impact is capable of proof at trial through common evidence.

*See In re High-Tech Emple. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1192 (N.D. Cal. 2013).  "This

is a question of methodology, not merit."  *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, No.

1917, 2013 U.S. Dist. LEXIS 137946, at *79 (N.D. Cal. Sep. 19, 2013).  Given the "well-

researched market at issue and the well-recognized type of antitrust injury alleged,"[24] courts

routinely find that impact from an antitrust violation in a prescription drug market can be shown

on a class-wide basis.[25]

In the First Circuit, the presence of a *de minimis* number of uninjured Class members

will not preclude certification.  *Nexium*, 777 F.3d at 24-25; *see also In re Urethane Antitrust

Litig.*, 768 F.3d 1245, 1254 (10th Cir. 2014); *Kohen v. Pac. Inv. Mgmt. Co. LLC & PIMCO

Funds,* 571 F.3d 672, 677 (7th Cir. 2009) ("[A] class will often include persons who have not

been injured by the defendant's conduct; indeed this is almost inevitable. . . Such a possibility or

indeed inevitability does not preclude class certification."); *Mims v. Stewart Title Guar. Co.*, 590

F.3d 298, 308 (5th Cir. 2009); *Flonase*, 284 F.R.D. at 226-27.

Dr. Conti's proposed damages model utilizes evidence common to the Class and shows

that lower-priced generic Asacol 400mg would have made significant inroads into the brand

volume upon market entry, capturing upwards of 90% of the market within six months.[26]

Plaintiffs will use common evidence to demonstrate that all Class members were impacted here.

---

[24] *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 U.S. Dist. LEXIS 24097, at *61 (N.D. Cal. Feb. 21, 2017).

[25] *See, e.g.*, *Nexium*, 297 F.R.D. at 179;  *Lidoderm*, 2017 U.S. Dist. LEXIS 24097, at *101; *Cardizem*, 200 F.R.D. at 308; *Flonase*, 284 F.R.D. at 230.

[26] *See generally Flonase*, 284 F.R.D. at 222 (E.D. Pa. 2012) ("Such rapid conversion [from the brand to generic drug] can be explained not only by the purchase price differential between the drugs, but also by state generic substitution laws that make the substitution of generic drugs for prescribed brand drugs either mandatory or within

### i.      Antitrust impact to consumers can be shown by common proof.

In arguing against Dr. Conti's analysis on common impact, Defendants exaggerate the number of allegedly uninjured consumers captured by the Class definition.  Defs. Br. at 16-18.  In an effort to argue that there is more than a *de minimis* number of uninjured members in the Class, Defendants first point to "brand loyalists," Asacol 400mg consumers who would not have purchased generic Asacol 400mg were it available.  Defs. Br. at 17.  Here, as in *Nexium*, Defendants fail to quantify the number of "brand loyalists" and the empirical data shows that this "uninjured group" would be extremely small.  In the but-for world where Asacol 400mg generic entry occurs, brand Asacol 400mg prescriptions would make up only 2.8% to 8.6% of the Asacol 400mg prescription base.[27]  This level of generic erosion is systematic and well-established.  Conti Decl. ¶¶ 26-30; Conti Reply ¶¶ 58, 71.  Those percentages, however, are transactions, not consumers.  The percentage of "brand loyalists" in the Class is certainly smaller than the 2.8% to 8.6% prescription volume because many, if not most, brand loyalists would try the generic version at least once, and a single generic purchase is enough to establish injury for a purchaser.  Conti Reply ¶ 26.  The First Circuit addressed and rejected this exact same issue and argument in *Nexium*.  777 F.3d at 30.  Defendants' argument is even more unpersuasive in this case because, unlike *Nexium* "brand loyalists," a substantial portion of Asacol 400mg "brand loyalists" *were* injured because Defendants' hard switch forced them to take brand Asacol HD, which costs even

---

the discretion of a pharmacist.  Furthermore, TPPs offer prescription drug formularies, i.e. tiered pricing, with lowers co-pays and coinsurance to encourage insured consumers to purchase a generic equivalent over the brand drug.").

[27] See Conti Decl. ¶ 50 (noting that the yardstick products "show generic penetration of over 90%"); *id*. Ex. C.8.a (generics would capture 97.2% of Asacol 400mg volume under Scenarios 1A and 2A); *id*. Ex. C.8.b (generics would capture 91.4% of Asacol 400mg volume under Scenarios 1B and 2B).

more than the brand Asacol 400mg product.  Conti Decl. ¶ 65, Att. C.10.a, column 12; Conti Reply ¶ 11.

Defendants also argue that there is a problematic number of "uninjured" Class members who used coupons or purportedly paid $0 for their Asacol HD and Delzicol prescriptions due to out-of-pocket maximums or other unique prescription drug benefits, in addition to "flat co-pay" insureds.  Defs. Br. at 17.  First, flat co-pay plans expressly excluded from the Class do not have damages included in Dr. Conti's model.  Pls. Br. at 3; Conti Decl. ¶ 66; Conti Reply ¶¶ 16-21, 55.  Second, Dr. Conti estimates that the number of prescriptions subject to discount coupons were "minimal, ranging from a fraction of a percent to about 6%."  Conti Decl. ¶ 64. Defendants' criticism on this point suffers from the exact same weakness as their "brand loyalist" argument; the number of "coupon" prescriptions is extremely low and Defendants do not substantiate (or quantify) the number of Class members who ostensibly obtained *every single* Asacol prescription with a coupon.  Conti Decl. ¶¶ 42-43.  Again, a single non-coupon purchase is enough to establish injury and there is no evidence of any—much less many—purchasers who used coupons for every single purchase.  *Nexium* too addressed and rejected this exact same argument.  777 F.3d at 28-29.

For consumers with "out-of-pocket maximums," Defendants similarly fail to substantiate (or quantify) any number of Class members who made *every single* Asacol purchase *after* they met their "out-of-pocket maximum."  There is no reason to believe this is a sizeable "uninjured" group captured by the Class definition.  To the extent a consumer made a single qualifying purchase of Asacol HD or Delzicol before the consumer reached the out-of-pocket maximum, the consumer was injured.  Further, even purchases by a consumer after reaching the "out-of-pocket maximum" have overcharges for the consumer's TPP partner.  Conti Reply ¶ 21.

### ii.   Antitrust impact to TPPs can be proven by common proof.

Defendants' claims regarding "uninjured TPP class members" fail for many of the same reasons as their arguments regarding "uninjured consumer class members."  Defendants claim that brand rebates and higher co-payments received by TPPs for Delzicol and Asacol HD purchases, in addition to certain PBM "risk-sharing" agreements, may offset the savings expected from generic Asacol 400mg, which "could result in TPPs paying more for generic drugs than brand drugs."  Defs. Br. at 18-19.  These arguments are untenable and have already been rejected by the First Circuit.  *Nexium*, 777 F.3d at 28-29.

As explained above, a single overcharge is sufficient to establish antitrust impact.  *Id*. at 27.  Therefore, a TPP needs to pay only *one* overcharge as a result of Defendants' conduct to suffer antitrust impact.  It is legally irrelevant to antitrust injury whether a TPP received brand rebates or made subsequent purchases that did not result in an overcharge; it is also legally irrelevant to antitrust injury whether an individual TPP "on net" benefitted more from brand rebates than generic entry.[28]   Even if those arguments were consistent with the law (and they are not), Defendants have failed to quantify factually any significant number of TPPs who would meet the hypothetical uninjured criteria.  Conti Reply ¶ 49.[29]

Dr. Strombom's analysis actually shows that each Named Plaintiff paid at least *one* overcharge on their Delzicol reimbursements, even when using his own arbitrary yardstick

---

[28] Even Dr. Strombom recognizes that brand rebates are an ex-post adjustment to TPP payments, often based on variables beyond the single Asacol prescription sale: "rebates are administratively processed *after* the prescription has been filled and paid for," not contemporaneously with the transaction.  Strombom Decl. ¶ 62 (emphasis added).

[29] Dr. Strombom points to only one instance where Minnesota Laborers paid more—on a single prescription—for generic Asacol HD than for the brand.  Strombom Decl. ¶ 60.  But a TPP can incur an overcharge on one transaction, while avoiding overcharges on subsequent transactions.  Dr. Strombom does not argue Minnesota Laborers or any other Plaintiff would have wholly escaped overcharges on *every* transaction.  Defendants do not even attempt to quantify the prevalence of completely uninjured TPPs corresponding to unique pharmacy contracts or copay structures.

price.[30]  Dr. Conti's proposed model—supported by the economic literature, real world data, and her own expert analysis—shows that generic Asacol 400mg prices would have been significantly lower than the price of Asacol HD and Delzicol in the real world, and that generic Asacol 400mg would have captured virtually all of the Asacol 400mg market within six months.  As such, Defendants' product hop injured all Class members by depriving them of the cost savings associated with cheaper generic equivalents to Asacol 400mg in the but-for world.  As in *Nexium*, the quantitative data and Dr. Conti's analysis show that Defendants exaggerate the prevalence of "uninjured" Class members without empirically substantiating their speculation.

### iii.    Plaintiffs have provided an accepted methodology for calculating aggregate class-wide damages.

In the First Circuit, "[t]he use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself."  *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197 (1st Cir. 2009)).  Certification is appropriate even if damages will vary across the Class.  *Nexium*, 777 F.3d at 21.  "Calculations [of damages] need not be exact."  *Comcast*, 133 S. Ct. 1426, at 1433.  "[I]t does not come with very good grace for a wrongdoer to insist about specific and certain proof of the injury which it has itself inflicted."  *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981) (internal citation and quotation marks omitted).  "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."  *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946).

---

[30] See Strombom Decl. Ex. 9a-9e.  Similarly, Dr. Strombom only argues that "in many instances" the but-for adjusted generic price is greater than the brand price, Strombom Decl. ¶ 65, suggesting other instances where the generic is lower and thus reflecting an overcharge.

Dr. Conti's aggregate damages calculation incorporates overcharges on a *transactional basis*. Where there is no overcharge on a given transaction, there is no effect on the aggregate damage calculation. For damages, she uses the Class definition to identify Class members and then uses that framework to identify prescriptions to include in the aggregate damages calculation. Conti Decl. ¶¶ 53-67; Conti Reply ¶ 8. Her methodology is constructed by reference to the well-researched and accepted understanding in the scholarly literature of the impact of generic competition on drug prices, in addition to real world data reflecting the prices and volume of Asacol 400mg, Asacol HD, and Delzicol and the prices and quantities sold for the "yardstick" products. Conti Decl. ¶¶ 26-38, 47-51; Conti Reply ¶¶ 8-10. This damage methodology has been accepted by numerous other courts.[31]

Defendants argue that Dr. Conti's use of "highly aggregated" prescription data, which "conceals variations" in purchase prices, "makes it impossible" to determine which Class members were injured and in what amount. Defs. Br. at 141. Defendants do not substantiate the assertion that there is meaningful price variation that undermines Dr. Conti's methodology. Conti Reply ¶ 60. The calculation of an average, by definition, incorporates variation contained in the dataset. Conti Reply ¶ 62.[32]

Facing an identical attack on the "yardstick" methodology, the *Nexium* court concluded that plaintiffs' expert "quite properly" conducted a class-wide overcharge analysis, and found that TPP-PBM contract terms are generally similar and prices—even with rebates—"trend

---

[31] *Nexium*, 297 F.R.D. at 176-183; *Lidoderm*, 2017 U.S. Dist. LEXIS 24097, at *100-01; *Teva Pharm*, 252 F.R.D. at 229-30; *Cardizem*, 200 F.R.D. at 308-309-42; *Flonase*, 284 F.R.D. at 220-225.

[32] *Nexium*, 297 F.R.D. at 182.

together" over time.  *Nexium*, 297 F.R.D. at 182.  The same is true here.  Dr. Conti has used the same data and methodology.

## VIII.   A CLASS ACTION IS A SUPERIOR METHOD OF ADJUDICATION

Defendants' only argument against superiority is that establishing injury "requires an individualized analysis that class treatment would not afford."  Defs. Br. at 20.  Incorrect; Dr. Conti's model shows that nearly all members suffered an antitrust injury as a result of Defendants' conduct.  Even were that not the case, "the need for some individualized determinations at the liability and damages stage does not defeat class certification."  *Nexium*, 777 F.3d at 21; *see also Lidoderm*, 2017 U.S. Dist. LEXIS 24097, at *103 (N.D. Cal. Feb. 21, 2017).  Even if Defendants were right that injury had to be determined individually (and they are not), individual lawsuits would require myriad individual courts to revisit all of the common liability issues *and* conduct individual impact inquiries. *See, e.g., Teva*, 252 F.R.D. at 228.  A class action is superior here even if one were to buy Defendants' "individual impact" argument.[33]

## IX.   CONCLUSION

WHEREFORE Plaintiffs respectfully request that the Court enter an Order certifying the above Class, appointing MN Laborers, Teamsters, NECA-IBEW, and WI Masons as representatives of the Class, and appointing Kenneth A. Wexler, Justin N. Boley, and Tyler W. Hudson as Co-Lead Counsel.

Dated:  August 16, 2017                              Respectfully submitted,

                                                /s/ Nathaniel L. Orenstein
                                                Nathaniel L. Orenstein (BBO #664513)

---

[33] As Defendants know, the reality is that without a class action, the misconduct alleged here is effectively immune from suit.  *Nexium*, 777 F.3d at 23 (citing *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.")).

**BERMAN TABACCO**
One Liberty Square
Boston, MA  02109
Tel: (617) 542-8300
Fax: (617) 542-1194
norenstein@bermantabacco.com

Todd A. Seaver
(645874)
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA  94104
Tel:  (415) 433-3200
Fax:  (415) 433-6382
tseaver@bermantabacco.com

*Liaison Counsel for the Proposed End-Payor Class*

Tyler W. Hudson
Eric D. Barton
David Barclay
**WAGSTAFF & CARTMELL, LLP**
4740 Grand Avenue, Ste. 300
Kansas City, MO 64112
T: (816) 701-1100
F:  (816) 531-2372
thudson@wagstaffcartmell.com
ebarton@wagstaffcartmell.com
dbarclay@wagstaffcartmell.com

Kenneth A. Wexler
Justin N. Boley
Tyler J. Story
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL  60603
T: (312) 346-2222
kaw@wexlerwallace.com
jnb@wexlerwallace.com
tjs@wexlerwallace.com

*Interim Co-Lead Counsel for the Proposed End-Payor Class*

Daniel E. Gustafson

Karla M. Gluek
Michelle J. Looby
Joshua J. Rissman
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
T: (612) 333-8844
F: (612) 339-6622
dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com

Jeffrey L Kodroff
William G. Caldes
John A. Macoretta
**SPECTOR ROSEMAN KODROFF &**
**WILLIS, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
T:  (215) 496-0300
F:  (215) 496-6611
jkodroff@srkw-law.com
bcaldes@srkw-law.com
jmacoretta@srkw-law.com

Peter J. Mougey (FL #0191825)
**LEVIN, PAPANTONIO, THOMAS,**
**MITCHELL, RAFFERTY & PROCTOR,**
**P.A.**
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
T: (850) 435-7000
F: (850) 435-7020
pmougey@levinlaw.com

Jonathan D. Karmel
**KARMEL LAW FIRM**
221 N. LaSalle Street, Suite 1307
Chicago, IL 60601
T: (312) 641-2910
jon@karmellawfirm.com

Karen Hanson Riebel
Heidi M. Silton
Devona L. Wells

20

**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
T:  (612) 339-6900
F:  (612) 339-0981
khriebel@locklaw.com
hmsilton@locklaw.com
dlwells@locklaw.com

William H. London
**FREED KANNER LONDON &
MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
T:  (224) 632-4500
F:  (224) 632-4521
blondon@fklmlaw.com

*Attorneys for Plaintiffs and the Proposed
Class*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2017, a true copy of the foregoing document was served on all counsel of record by electronically filing the document with the Court's CM/ECF system.

_/s/ Nathaniel L. Orenstein_____
Nathaniel L. Orenstein