**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In Re: ASACOL ANTITRUST LITIGATION | Civil Action No. 1:15-cv-12730 (DJC) |
| This Document Relates To: | |
| ALL END-PAYOR ACTIONS | |

**END-PAYOR PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**MOTION TO EXCLUDE THE TESTIMONY OF**
**DR. BRUCE A. STROMBOM**

**(PUBLIC REDACTED VERSION)**

## Introduction

End-Payor Plaintiffs ("Plaintiffs") seek to exclude in its entirety the expert report of Dr.

Bruce Strombom.  Dr. Strombom's opinion is based on a legally erroneous interpretation of

"antitrust injury" that is contrary to binding Supreme Court and First Circuit precedent.  The

First Circuit has rejected as a matter of law the same "antitrust injury"[1] analysis propounded by

Dr. Strombom here.  Whereas Dr. Strombom conflates antitrust injury and damages, the

applicable First Circuit precedent delineates a clear boundary between the two concepts:

> "Paying an overcharge caused by the alleged anticompetitive conduct on a single
> purchase suffices to show—as a legal and factual matter—impact or fact of
> damage. . . [D]efendants incorrectly assume that if a class member offsets an
> overcharge through later savings attributable to the same or related transaction,
> there is no injury.  But antitrust injury occurs the moment the purchaser incurs an
> overcharge, whether or not that injury is later offset.  Here, if a class member is
> overcharged, there is an injury, even if that class member suffers no damages"

*In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) (internal citation and quotation

marks omitted).

In direct contravention of First Circuit and Supreme Court precedent, Dr. Strombom

opines that: (1) Plaintiffs' antitrust injury is affected by "net" purchasing experiences in the

aggregate, (2) Plaintiffs' antitrust injury is affected by "pass-through" of overcharges via the

premiums and/or member contributions collected by third-party payors ("TPPs"), and (3) the

proposed Class contains a large number of "uninjured" Class members.  As a result of his faulty

"antitrust injury" analysis, Dr. Strombom concludes that Plaintiffs' expert Dr. Rena Conti cannot

demonstrate antitrust impact on a classwide basis and, further, that the proposed Class definition

includes a significant number of "uninjured" Class members.  Dr. Strombom's opinion is based

on a fundamental misapplication of the applicable law; his erroneous definition of "antitrust

---

[1] "Antitrust injury" is often used interchangeably with the term "antitrust impact."

injury" taints all of his conclusions.  Accordingly, Plaintiffs request the Court exclude Dr. Strombom's expert report in its entirety.

## Standard of Review

The proponent of proffered expert testimony bears the burden of demonstrating the admissibility of that testimony by a preponderance of the evidence.  See *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 592 n.10 (1993).  An expert must be qualified to testify "by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  If an expert is qualified, the Court must determine whether (1) "the testimony is based upon sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case." *Id*.  A baseline requirement of Rule 702 is that the proposed testimony "help the trier of fact to understand the evidence or to determine a fact in issue."  This requirement is "akin to the relevance requirement of Rule 401, which is applicable to all proffered evidence[,] [but] . . . goes beyond mere relevance. . . because *it also requires expert testimony to have a valid connection to the pertinent inquiry*." *In re Rezulin Prods. Liab. Litig*., 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004) (emphasis added).  The *Daubert* Court termed this "'fit,'" observing that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.*

As such, district court judges play "a vital 'gatekeeper' role in ensuring the integrity of expert testimony." *Ambit Corp. v. Delta Airlines, Inc*., 707 F. Supp. 2d 74, 76 (D. Mass. 2010) (citations omitted).  The "exercise of the trial court's gatekeeper authority [is encouraged] when parties proffer, through purported experts, not only unproven science, but markedly incorrect law.  Incorrect statements of law are no more admissible through 'experts' than are falsifiable scientific theories." *Herbert v. Lisle Corp*., 99 F.3d 1109, 1117 (Fed. Cir. 1996) (internal

citation omitted).  "Expert testimony must be circumscribed carefully to ensure that 'the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law and the role of the jury in applying that law to the facts before it." *In re Rezulin*, 309 F. Supp. at 557 (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)).  Moreover, "[a] court may conclude there is simply too great an analytical gap between the data and the opinion proffered." *GE v. Joiner*, 522 U.S. 136, 146 (1997).  "Admission of expert testimony based on speculative assumptions is an abuse of discretion."  *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996) (per curiam) (quoted in *Seahorse Marine Supplies, Inc. v. P.R. Sun Oil Co.*, 295 F.3d 68, 82 (1st Cir. 2002)); see also Irvine v. Murad Skin Research Labs., Inc.*, 194 F.3d 313, 321 (1st Cir. 1999) ("Absent adequate factual data to support the expert's conclusions his testimony was unreliable").

Finally, the Court must weigh the balancing factors of Federal Rule of Evidence 403 in considering the admissibility of expert testimony.  "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses."  *Daubert*, 509 U.S. at 595 (citation omitted).

<u>Argument</u>

**A.  Dr. Strombom's expert opinion is legally irrelevant and therefore inadmissible.**

In this case, whether the Plaintiffs and the proposed Class members suffered antitrust injury, and whether Plaintiffs can demonstrate the existence of antitrust injury on a classwide basis, are key issues in dispute.  Defendants intend to proffer the expert report of Dr. Strombom to bolster their legally untenable argument that the Plaintiffs have not suffered antitrust injury if their purchases—in the aggregate—somehow offset certain overcharges incurred as a result of Defendants' conduct.  Dr. Strombom mistakenly believes that the "pertinent inquiry"—whether

4

or not there is classwide proof of antitrust injury—swings on an analysis of each Class member's *net* economic experience.  In other words, Dr. Strombom erroneously opines that a purchaser's overcharge transactions, *i.e.*, its antitrust injuries, may be "netted out" by other transactions in which the purchaser may have *benefited* from the absence of generic Asacol 400mg as a result of Defendants' anticompetitive conduct.  Expert Report of Bruce A. Strombom ("Strombom Rep."), at ¶¶ 9.ii, v-vi, 35, 40, 42, 55, 58, 64-66 (attached as Exhibit A hereto); Transcript of August 14, 2017 Deposition of Bruce A. Strombom ("Strombom Tr.") at 228:6-14, 259:17-260:8, 283:5-20 (attached as Exhibit B hereto).  Thus, through Dr. Strombom, Defendants seek to proffer "markedly incorrect law."[2]  Because Dr. Strombom departs from established First Circuit and Supreme Court precedent on the existence of antitrust injury, his report is irrelevant to the task of assessing antitrust injury and will do nothing more than confuse the jury on issues in this case.

1. **Because antitrust injury occurs at the moment of the overcharge, Dr. Strombom's opinions on third-party payor net purchasing experiences are irrelevant .**

Dr. Strombom's expert report and deposition testimony illuminate his failure to properly account for the legally-binding definition of antitrust injury.  In his own words, when Dr. Strombom refers to "uninjured Class members," he means Class members who suffered zero damages.  Strombom Tr. at 19:22-20:05.   It follows that "antitrust injury" is the "damage/injury that results from antitrust violations or anticompetitive conduct."  Strombom Tr. at 180:5-10. "For example, in this case, the actual purchase price that takes place. . . at the time of the – prescription, has to also be adjusted to account for the fact that rebates may occur at some later point" to determine antitrust impact.  Strombom Tr. at 259:17-260:8.   Therefore, in his view, "the question of injury is. . . the net impact, as I use that word, the net damages. . . and whether

---

[2] *See Herbert*, 99 F.3d at 1117.

there are actual damages that result" from the antitrust violation.  Strombom Tr. at 283:5-17.

When Dr. Strombom refers to "injury," "impact," or "damages," he "use[s] them synonymously

in this case."  Strombom Tr. at 261:2-5, 283:18-20.[3]  Dr. Strombom's synonymous treatment of

"antitrust injury" and damages is "markedly incorrect law."  *See Nexium*, 777 F.3d at 27 ("Here,

if a class member is overcharged, there is an injury, even if that class member suffers no

damages."); *In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168, 179 (D. Mass. 2013)

("The antitrust impact concept differs from the related task of assessing antitrust damages."); *see

also Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 n.14 (1972) ("[C]ourts will not go

beyond the fact of this injury to determine whether the victim of the overcharge has partially

recouped. . . ").[4]

---

[3] *See also* Strombom Tr. at 259:17-260:8 (Q. So when does antitrust – when does that impact occur?  A. Well, it can occur at the – at the point of injury or there can be follow-on effects.  For example, in this case, the actual purchase price that takes place, say, at the time of the – a prescription, has to also be adjusted for or account for the fact that rebates may occur at some later point.  But the important thing from an economic perspective is that you include all the impacts from the conduct, whether they occur at the instant of the – of the purchase or subsequently, and be they either positive or negative.); 283:5-17 (A. I think the question of injury is the – is the more inclusive question with respect to the larger – you know, the net impact, as I use that word, the net damages, the positive and negative effects, and whether there are actual damages that result from it versus a change in outcome as a consequence of the alleged conduct.).

[4] Other federal courts analyzing state antitrust claims for end-payors in pharmaceutical cases have confirmed that the "overcharge" is the correct reference point for antitrust injury.  *See, e.g.*, *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 U.S. Dist. LEXIS 24097, at *93 (N.D. Cal. Feb. 21, 2017); *In re Lorazepam & Clorasepate Antitrust Litig.*, 295 F. Supp. 2d 30, 42 (D.D.C. 2003);; *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 250-51 (D. Del. 2002); *see also Tawfilis v. Allergan, Inc.*, No. 8:15-cv-00307-JLS-JCG, 2017 U.S. Dist. LEXIS 122974, at *38 (C.D. Cal. June 26, 2017) (discussing overcharge antitrust injury, and noting that "[p]otential offsets, if they have any legal relevance, would affect the amount of damages, not the fact of damage."); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 2016 WL 3770957, at *7 (N.D. Ga. 2016) (the "Court concludes that a person suffers a cognizable injury and is impacted by a price-fixing conspiracy at the moment he pays an antitrust overcharge, even if the anticompetitive conduct at issue also results in offsetting benefits"); *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293, 304 (D.D.C. 2007) ("[A]ntitrust injury occurs and is complete when the defendant sells at the illegally high price." (internal citation and quotation marks omitted)).

Since Dr. Strombom begins with a "markedly incorrect" legal premise, his entire analysis is fatally flawed; it focuses on *net* purchasing experiences, "average" pricing across numerous purchases, and the incorporation of legally-irrelevant and factually unsubstantiated "offsets" instead of analyzing whether each Class member had a *single* overcharge transaction.  The excerpts below describing "uninjured" TPP Class members illustrate Dr. Strombom's mistakes and, therefore, the unreliability and ultimate irrelevance of his opinion on antitrust injury in this case (emphasis added below):

- "Third-party payor class members who, as a result of decreased copay/coinsurance payments for a generic, paid less *on net* for the branded product."  Strombom Rep. ¶ 9.v

- "Third-party payor class members who, as a result of rebates received for their branded product prescriptions, paid less *on net* than they would have for an alleged generic had it been available." Strombom Rep. ¶ 9.vi

- "The size of the rebates the third-party payors receive on the branded products can also result in their *net amount reimbursed* for the product being less than what they would have reimbursed for the generic in a but-for world."  Strombom Rep. ¶ 58.[5]

- 

Strombom Rep. ¶ 65.

Strombom Rep. ¶ 66.

---

[5] Dr. Strombom concedes that "the rebate doesn't take place at the pharmacy counter."  Strombom Tr. at 163:1-10.

When analyzed under the correct standard of antitrust injury, Dr. Strombom's own analysis demonstrates that each Named Plaintiff incurred at least one overcharge as a result of Defendants' anticompetitive product hop and therefore suffered antitrust injury.  See Strombom Rep. Ex. 9a-9e.  In the First Circuit, a single overcharge is sufficient to establish antitrust injury for each Plaintiff here, as well as the proposed Class members.  *Nexium*, 777 F.3d at 27 ("Paying an overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show—as a legal and factual matter—impact or fact of damage.").  Dr. Strombom does not reliably substantiate his opinion that 40% of TPP Class members (*at a minimum*) were actually "uninjured" as defined by binding antitrust precedent (i.e., escaped overcharges on every single transaction), nor does Dr. Strombom identify even a single TPP Class member that did not suffer an overcharge on at least one transaction.  In other words, there is too great an analytical gap— both empirically and conceptually—between the data and analysis used by Dr. Strombom and his opinion that 40% of TPP Class members were "uninjured" as a result of Defendants' conduct.  Strombom Rep. ¶ 10.  Thus, contrary to what Dr. Strombom and Defendants would have the jury believe, the antitrust jurisprudence clearly instructs that the question of purchaser antitrust *injury* (as opposed to the appropriate quantum of *aggregate classwide damages*) begins and ends with the transactional overcharge inquiry—that is, whether the purchaser was overcharged on one transaction.  Accordingly, Dr. Strombom's opinion on the prevalence of "uninjured" TPP Class members is unreliable as it is based on an incorrect legal premise and should be excluded.

### a.  Dr. Strombom's opinion on the number of uninjured consumer Class members is similarly flawed.

Dr. Strombom's opinion on the prevalence of "uninjured" consumer Class members is flawed for the same reasons as his uninjured TPP Class member analysis: he focuses on aggregate net purchasing experience, not whether the consumer incurred a single overcharge.

8

See Strombom Rep. ¶¶ 9.ii, 40-42, 55; Strombom Tr. at 228:6-14.  Again, the excerpts below

describing "uninjured" consumer Class members are representative of Dr. Strombom's legally

erroneous, and inherently unreliable, antitrust injury analysis (emphasis added below):

- "Consumer class members who paid $0 *on net* for their brand prescription."
  Strombom Rep. ¶ 9.ii

- "Consumer class members who received coupons or used discount cards and as a
  result paid less, or the same, for their brand prescription as they would have paid for
  an alleged generic."  Strombom Rep. ¶ 9.iv

- "For example, consumers' prescription drug benefit may have an 'out-of-pocket
  maximum' that is specified by their health plan, whereby once the consumer has had
  expenditures on prescription drugs (and often other medical procedures are included
  as well) that reach the out-of-pocket threshold, the consumer has *a net $0 payment for
  future drug purchases* until the end of the health plan's period (e.g., the end of the
  calendar year).  Other consumers also may belong to plans where the consumer bears
  no cost for the drug after a deductible has been met."  Strombom Rep. ¶ 40.

- "[T]here is some ambiguity as to their class status, particularly if the consumer made
  an initial payment for the drug product, but was then subsequently reimbursed the
  entire amount of their payment, making their *net payment* $0.  This ambiguity aside,
  these particular consumers *would not be injured* as a result of Defendants' alleged
  anticompetitive actions."  Strombom Rep. ¶ 41.

- ███████████████████████████████████████████████████
  ███████████████████████████████████
  Strombom Rep. ¶ 42.

- "Determining exactly how many of these thousands of consumers using coupons
  were injured would require knowledge of *how many prescriptions they purchased
  both with and without coupons*, and whether they would have purchased the generic
  had it been available, and how much their copay or coinsurance would have been."
  Strombom Rep. ¶ 55 (emphasis added).

- Q. So if I understand you then, if -- if a consumer uses a -- used a coupon for their
  first Asacol® HD purchase but -- but never used coupons again for the remaining
  purchases, would those consumers be injured under your analysis? A. Well, they
  could be injured. I mean, they're – that's – I'll just say they could be
  injured.  Strombom Tr. at 228:6-14.

Properly framed, the antitrust injury analysis focuses on proof that Class members

suffered an overcharge on a *single* transaction; if so, there is antitrust injury.  Dr. Strombom has

not provided any evidence of a single consumer who escaped overcharges on every single transaction via coupon usage  (which Dr. Strombom estimates to be ████████████ ███████████████ of consumer Class members) or by paying for every single Asacol franchise prescription only after meeting a deductible or out-of-pocket maximum ████████████████████████████ in Dr. Strombom's estimation) in every health plan cycle within the Class period.  See Strombom Rep. ¶¶ 43, 55.  Instead, Dr. Strombom provides a superficial analysis of "net" purchasing experiences"[6] and incorporates a variety of speculative overcharge "offsets," yet he fails to provide a single example of an "uninjured" Class member who actually, in fact, suffered no overcharge on *any* transaction.  Again, the analytical gap between the data and methodology utilized by Dr. Strombom and the opinion he seeks to present is just too great for him to reliably opine on the purported existence of "uninjured" consumers Class members.[7]  His attempt to "quantify" the number of "uninjured" Class members is

---

[6] In at least one instance, Dr. Strombom attempts to equate the percentage of Asacol HD and Delzicol prescriptions subject to a $0 payment with the percentage of "uninjured" consumer Class members.  See Strombom Rep. ¶ 43 (extrapolating from a single Named Plaintiff's claims data that ████████████████████ ████████████ to estimate that ████████████████████████████████ but explaining—most importantly—at footnote 58 that ████████████████████ ███████████████████████████ emphasis added)).  The First Circuit has previously rejected this attempt at extrapolation.  *Nexium*, 777 F.3d at 27-28 (noting that "defendants incorrectly treat individual prescriptions of Nexium as a proxy for individual consumers," and explaining that "there is no necessary relationship between the percentage of prescriptions and the percentage of consumers since a class member may fill one prescription with an overcharge and another with no overcharge").

[7] That Dr. Strombom has failed to reliably quantify the existence of any uninjured consumer Class members is consistent with Dr. Conti's analysis of his expert report.  *See, e.g.,* Transcript of September 6, 2017 Deposition of Rena Conti at 249:12-19 (testifying that "[t]here is no evidence" of any consumers who made all of their Asacol franchise purchases only after meeting their deductible or out-of-pocket maximum), 249:20:250:1 (testifying that she "was unable to find any evidence to support that conjecture" that consumers may have only used coupons to purchase Asacol franchise products), 252:3-253:8 ("Because I suspect that the vast majority of people who use coupon or discount cards use them once but not -- or certainly not for all their prescriptions."), 260:19-261:6 ("But, again, my assessment of Dr. Strombom and Dr. Zona's report is that they don't provide any evidence to support that contention" that a significant number of consumers used coupons for all their purchases).

predicated on a markedly incorrect understanding of what it means to be "injured" in the context of this case.  Accordingly, the Court should exclude Dr. Strombom's opinion on the prevalence of "uninjured" consumer Class members.

> **2.  Because antitrust injury occurs at the moment of the overcharge, Dr. Strombom's opinion that TPPs "pass-on" overcharges is legally irrelevant.**

Finally, through Dr. Strombom, Defendants seek to argue that the TPP Plaintiffs suffer no antitrust injury because they "pass-on" overcharges to insureds via the premiums and member contributions they collect.  For example, in his report, Dr. Strombom claims that "the extent that the alleged anticompetitive product switching strategy resulted in increased costs for third-party payors, any such increase is likely to have been offset by an increase in the premiums paid by consumers in future periods."  Strombom Rep. ¶ 67.  Dr. Strombom recognizes as a factual matter, however, that any purported overcharge "pass-on" takes place after the overcharge transaction and is not tied to the costs of a specific drug, but to increased healthcare costs generally.  Strombom Tr. at 186:21-187:11, 189:5-190:21, 192:4-193:9, 193:15-194:16, 249:16-250:16; Strombom Rep. ¶¶ 67-69; *see also Nexium*, 777. F.3d at 27 ("[A]ntitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset.").  Therefore, under a proper antitrust injury analysis, and even assuming TPPs "pass-on" overcharges to their insured members (which they do not), any purported "pass-on" is an offset to an overcharge and irrelevant to antitrust injury.

Furthermore, the "pass-on" defense has been rejected under federal antitrust law[8] and by the First Circuit in *Nexium* in analogous circumstances involving state law antitrust claims.

---

[8] *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 487-494 (1968); *Adams v. Mills*, 286 U.S. 397, 407 (1932) ("In contemplation of law the claim for damages arose at the time the extra charge was paid.  Neither the fact of subsequent reimbursement by the plaintiffs from funds of the shippers, nor the disposition which may hereafter be made of the damages recovered, is of any concern to the wrongdoers."); *S. Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533-34 (1918) (rejecting

*Nexium*, 777 F.3d at 27.  None of the twenty-six states with claims in this case recognizes the pass-through defense under the circumstances present here.  Most Class states expressly follow federal antitrust law[9] (which necessarily includes *Hanover Shoe*), precluding the "pass-through" antitrust defense in all circumstances.  Indeed, some state courts have directly confronted the *Hanover Shoe* pass-through defense analysis and confirmed *Hanover Shoe's* application.  *See*, *e.g.*, *State by Humphrey v. Philip Morris, Inc.*, 551 N.W.2d 490, 496-97 (Minn. 1996) (noting that "[the pass-through defense] has been uniformly rejected in the courts, primarily on the theory that the injury is sustained as soon as the price, artificially raised for whatever reason, has been paid," and holding that "it was the intent of the Minnesota legislature to abolish the availability of the pass through defense" ); *Hyde v. Abbott Labs.*, 473 S.E.2d 680, 684-85 (N.C. Ct. App. 1996) (explaining that federal case law before the 1969 North Carolina statutory amendments, including *Hanover Shoe*, but not *Illinois Brick* in 1977, was incorporated into the North Carolina antitrust statute).[10]  Almost all of the remaining states expressly restrict the "pass-through" defense to "pass-through" in the chain of distribution where there are other more

---

[9] challenge to shipper claims for overcharge damages where the shipper could pass on the overcharge to its customers, stating "[t]he plaintiffs suffered losses to the amount of the verdict when they paid.  Their claim accrued at once in the theory of the law and it does not inquire into later events"); *Howell Indus. v. Sharon Steel Corp.*, Nos. 82-1885 and 82-1931, 1984 U.S. App. LEXIS 13488, at *8-9 (6th Cir. Dec. 7, 1989) (noting the rejection of pass-on in antitrust law, and concluding, "[w]e believe that the pass-through defense has been well discredited in all jurisdictions which have considered it since it was first raised").

[9] See App. B to End-Payor Pls.' Mem. In Supp. of Class Certification, ECF No. 381-2.

[10] While Plaintiffs bring claims under the California Unfair Competition Law, the California Supreme Court has likewise confirmed the application of *Hanover Shoe* under its antitrust statute. *See,e.g.,Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1086 (Cal. 2010) (emphasizing "the Legislature's endorsement of *Hanover Shoe*" and holding, "under the Cartwright Act as under federal law, that a pass-on defense generally may not be asserted.  Instead. . . the presumptive measure of damages is the amount of the overcharge paid by the plaintiff"); *see also id*. at 1087  ("Section 17204 [of the UCL] requires only that a party have 'lost money or property,' and Pharmacies indisputably lost money when they paid an allegedly illegal overcharge.  We decline Manufacturers' invitation to turn this facially simple threshold condition into a requirement that plaintiffs prove compensable loss at the outset.").

eligible plaintiffs further down the chain.[11]  It is no surprise that the "pass-through" defense is

limited to the chain of distribution in those states that recognize it, as it has always been held to

be a chain of distribution defense under federal law.  *Ill. Brick Co. v. Ill.*, 431 U.S. 720, 732

(1977) (analyzing pass-on by reference to allocation concerns within the chain of distribution);

*Paper Sys. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 633 (7th Cir. 2002) (Easterbrook, J.)

(characterizing the pass-on analysis as "tracing overcharges through the chain of distribution");

*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1163 (3rd Cir. 1993) (describing

the "pass-on theory" as "a theory that illegal overcharges have been passed on through a chain of

distribution"); *In re Beef Industry Antitrust Litig.*, 600 F.2d 1148, 1153 n.2 (5th Cir. 1979)

(describing "pass-on" as "the process whereby a middleman in the chain of distribution who has

been overcharged by a manufacturer or by a producer adjusts his prices upward in sales to a

lower level in the chain [of distribution] to reflect the overcharge"); *In re Brand Name*

*Prescription Drugs Antitrust Litig.*, No. 94-C-0897, 1996 U.S. Dist. LEXIS 4335, at *83 n.22

(N.D. Ill. 1996) ("'Pass-on' is a process by which an entity in a chain of distribution adjusts its

price upward to compensate for an overcharge by a prior party in the chain.  Normally, this

occurs when sellers pass on costs downward in the chain of distribution from the manufacturer to

the ultimate purchaser." (internal citation omitted)).  Thus, even if the "pass on" defense was not

---

[11] *See* N.M. STAT. ANN. § 57-1-3 (restricting "pass-through" damages defense to overcharge "pass-through" in "the chain of manufacture, production, or distribution");NEB. REV. STAT. § 59-821.01 (restricting the "pass-on" defense to situations where "the illegal overcharge. . . has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of such damages"); *Bunker's Glass Co. v. Plinkington PLC*, 75 P.3d 99, 108 (Ariz. 2003) (noting that "most of the *Illinois Brick* repealer statutes leave the solution to the double-recovery problem to the courts,", but concluding that "[t]he complexity of proving damages through multiple levels of sales is a daunting task, but one to which our courts are equal"); *GFS of Madison, Inc. v. Rhone Poulenc S.A.* (also referred to as *J&R Ventures v. Rhone Poulenc S.A.*), Case No. 00 CV 1143, at *2 (Wis. Cir. Ct. Dec. 4, 2006) (allowing the use of the "pass-on" defense where the retailer plaintiffs could pass-on all or some of the overcharge to other "purchasers" further down the chain of distribution).

rejected by applicable precedent—and it has been—it is still inapplicable here because End-Payor Plaintiffs are the *last* purchasers in the chain of distribution; they do not resell the products.  *See Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1414-15 (7th Cir. 1995) (Posner, J.) (holding that insurer plaintiff was entitled to claim antitrust overcharge damages: "Blue Cross paid Marshfield Clinic directly, in accordance with Blue Cross's contractual obligations to its insureds, and if it paid too much because the Clinic violated the antitrust laws then it ought to be allowed to sue to recover these damages.").

Dr. Strombom's "pass-on" opinion is based on "markedly incorrect law" and should be excluded.[12]

### 3.  Dr. Strombom's opines on an ascertainability standard inconsistent with First Circuit precedent.

In the First Circuit, a proposed class is ascertainable where "the court [is] able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria."  *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 139 (1st Cir. 2012) (quoting 5 James Wm. Moore et al., Moore's Federal Practice § 23.21[3][a] (3d ed. 2012)).  "The presence of such an objective criterion overcomes the claim that the class is unascertainable."  *Id.*  Dr.

---

[12] Notably, Dr. Strombom also fails to factually substantiate his assertion that Asacol overcharges are "likely" to have been recouped through TPP insurance premiums or TPP employee/employer contributions.  Strombom Rep. ¶ 67.  Dr. Strombom has not identified a single TPP that has increased premiums or member contributions as a result of overcharges incurred on a single drug, let alone for overcharges related to Asacol HD or Delzicol; indeed, his own testimony acknowledges the fact that premiums are intended to cover health care costs generally.  See Strombom Rep. ¶ 68 (noting only that Wisconsin Masons considered increasing contribution rates, among other alternatives, in response to "a 7% increase in *medical costs*" (emphasis added)); Strombom Tr. at 186:21-187:14, 189:5-190:21, 192:5-193:9, 193:15-194:3, 249:16-250:6.  In pushing the argument that overcharges are somehow "passed on" via premiums, Defendants seek to obtain immunity for TPP antitrust claims—courts have generally refused to recognize consumer claims related to inflated premiums.  *See, e.g.*, *Erie Castings Co. v. Grinding Supply, Inc.*, 736 F.2d 99 (3d Cir. 1984); *Perry v. Am. Tobacco Co.*, 324 F.3d 845 (6th Cir. 2003); *Steele v. Hospital Corp. of America*, 36 F.3d 69 (9th Cir. 1994); *Unique Paint Co. v. Wm. F. Newman Co.*, 411 S.E.2d 352 (Ga. Ct. App. 1991); *Southland Constr., Inc. v. Greater Orlando Aviation*, 860 So. 2d 1031 (Fla. Dist. Ct. App. 2003); *N. States Contracting Co. v. Oakes*, 253 N.W. 371 (Minn. 1934); *RK Constructors v. Fusco Corp.*, 650 A.2d 153 (Conn. 1994); *Whirley Indus. v. Segel*, 462 A.2d 800 (Pa. Super. Ct. 1983).

Strombom criticizes Dr. Conti for "not propos[ing] an appropriate, objective test for applying the dual purchase condition in the class definition" to identify and/or remove "uninjured" Class members, "let alone one with objective criteria that would be administratively feasible to implement. . ."  Strombom Rep. ¶ 14; *see also id.* ¶¶ 35, 39, 41, 47, 96-98, 115.  The ascertainability requirement in the First Circuit requires only an "objective criterion" by which to determine Class membership, not that Plaintiffs affirmatively identify individual Class members, and Plaintiffs have provided that objective criterion here in the proposed Class definition. Whether an individual or TPP qualifies as a Class member is ascertainable under the objective criteria of purchases of Asacol franchise products and includes those who purchased Asacol 400mg prior to July 31, 2013, and also purchased Asacol HD or Delizcol after July 31, 2013. *See Matamoros*, 699 F.3d at 139 ("The class is ascertainable under the objective standard of job titles and includes those who worked as baristas during the class period.").  In Dr. Strombom's view, he "do[esn't] think the Class definition has anything to do with whether [Class members] are identifiable or not."  Strombom Tr. at 109:6:10.  Dr. Strombom is incorrect; the Class definition sets forth the objective criteria that determines Class membership.  Indeed, Dr. Strombom at one point acknowledges as much: by ascertainability, he "mean[s] that you can go through the various criteria that are included in the definition of the 'class,' take a potential class member and make a determination as to whether they meet the criteria of the class and – and thereby are class members. . ."  Strombom Tr. at 5:18-23.

Dr. Strombom repeated insistence that ascertainability requires the affirmative identification of individual Class members is contrary to First Circuit precedent, and so is his opinion that such identification must be "administratively feasible."  Strombom Rep. ¶¶ 14, 35, 39, 41, 47, 96-98; Strombom Tr. at 5105:2-22, 106:8-107:10, 108:23-109:10, 205:8-19.  Dr.

Strombom's opinion is predicated on a markedly incorrect understanding of what "ascertainability" requires in the First Circuit.  Accordingly, the Court should exclude Dr. Strombom's opinion on the ascertainability of Class members.

<u>**Conclusion**</u>

The Court should exclude Dr. Strombom's opinion and testimony in its entirety because it is premised on "markedly incorrect law" and inherently unreliable as a result.  His opinion has no "tendency to make a *fact of consequence* in determining this action more or less probable than it would be without the evidence."  *See* FED. R. EVID. 401 (emphasis added).

Dated: September 11, 2017                           Respectfully submitted,

                                                    <u>*/s/ Nathaniel L. Orenstein*</u>
                                                    Nathaniel L. Orenstein (BBO #664513)
                                                    **BERMAN TABACCO**
                                                    One Liberty Square
                                                    Boston, MA  02109
                                                    Tel: (617) 542-8300
                                                    Fax: (617) 542-1194
                                                    norenstein@bermantabacco.com

                                                    Todd A. Seaver
                                                    (645874)
                                                    **BERMAN TABACCO**
                                                    44 Montgomery Street, Suite 650
                                                    San Francisco, CA  94104
                                                    Tel:  (415) 433-3200
                                                    Fax:  (415) 433-6382
                                                    tseaver@bermantabacco.com

                                                    *Liaison Counsel for the Proposed End-
                                                    Payor Class*

                                                    Tyler W. Hudson
                                                    Eric D. Barton
                                                    David Barclay
                                                    **WAGSTAFF & CARTMELL, LLP**
                                                    4740 Grand Avenue, Ste. 300

Kansas City, MO 64112
T: (816) 701-1100
F:  (816) 531-2372
thudson@wagstaffcartmell.com
ebarton@wagstaffcartmell.com
dbarclay@wagstaffcartmell.com

Kenneth A. Wexler
Justin N. Boley
Tyler J. Story
**WEXLER WALLACE LLP**
55 W. Monroe Street, Suite 3300
Chicago, IL  60603
T: (312) 346-2222
kaw@wexlerwallace.com
jnb@wexlerwallace.com
tjs@wexlerwallace.com

*Interim Co-Lead Counsel for the Proposed
End-Payor Class*

Daniel E. Gustafson
Karla M. Gluek
Michelle J. Looby
Joshua J. Rissman
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
T: (612) 333-8844
F: (612) 339-6622
dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com

Jeffrey L Kodroff
William G. Caldes
John A. Macoretta
**SPECTOR ROSEMAN KODROFF &
WILLIS, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
T:  (215) 496-0300
F:  (215) 496-6611

jkodroff@srkw-law.com bcaldes@srkw-law.com jmacoretta@srkw-law.com

Peter J. Mougey (FL #0191825)
**LEVIN, PAPANTONIO, THOMAS, MITCHELL, RAFFERTY & PROCTOR, P.A.**
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
T: (850) 435-7000
F: (850) 435-7020
pmougey@levinlaw.com

Jonathan D. Karmel
**KARMEL LAW FIRM**
221 N. LaSalle Street, Suite 1307
Chicago, IL 60601
T: (312) 641-2910
jon@karmellawfirm.com

Karen Hanson Riebel
Heidi M. Silton
Devona L. Wells
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
T:  (612) 339-6900
F:  (612) 339-0981
khriebel@locklaw.com
hmsilton@locklaw.com
dlwells@locklaw.com

William H. London
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
T:  (224) 632-4500
F:  (224) 632-4521
blondon@fklmlaw.com

*Attorneys for Plaintiffs and the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 11, 2017, a true copy of the foregoing document was served on all counsel of record by e-mail.

*/s/ Nathaniel L. Orenstein*
Nathaniel L. Orenstein
